Filed 7/8/14  P. v. Ortiz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055188 |
| v. | (Super.Ct.No. RIF124075) |
| EDUARDO RAMIREZ ORTIZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed.

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant, Eduardo Ramirez Ortiz, guilty of grand theft. (Pen. Code, § 487, subd. (a).)[1] The jury found true the allegation defendant took more than $65,000 from the victim. (§ 12022.6, subd. (a)(1).) The trial court sentenced defendant to county jail for a term of three years, with two years of that term to be served on supervised release, also referred to as "mandatory supervision." (§ 1170, subd. (h)(5)(B).)

Defendant raises 14 issues on appeal. First, defendant asserts there is insufficient evidence supporting his theft conviction under a theory of embezzlement. Second, defendant contends there is insufficient evidence supporting his theft conviction under a theory of false pretenses. Third, defendant contends the trial court erred by failing to instruct the jury that accomplice testimony must be viewed with caution and be corroborated. Fourth, defendant asserts the trial court erred by failing to instruct the jury on the law of coconspirator testimony. Fifth, defendant asserts he was denied his right to a speedy trial.

Sixth, defendant asserts the trial court erred by excluding evidence of conversations between defendant and Chris Sorenson because the "whole conversation" rule should have been applied. (Evid. Code, § 356.) Seventh, defendant contends the trial court erred by not permitting defense counsel to question Chris Sorenson about the entirety of two law enforcement reports because the reports were used to refresh Chris Sorenson's recollection. (Evid. Code, § 771.)

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

2

Eighth, defendant asserts the trial court erred by admitting evidence of defendant's conversations with an attorney. Ninth, defendant contends the trial court erred by giving the prosecutor permission to question defendant about defendant's later arrest for cultivating marijuana plants and possessing marijuana.

Tenth, defendant contends he was denied his right to counsel because he did not have an attorney at the time of his "wobbler" hearing. (§ 17, subd. (b).) Eleventh, in the alternative, defendant contends he received ineffective assistance of counsel at the wobbler hearing because his codefendant's attorney had a conflict of interest in representing defendant. Twelfth, defendant asserts the trial court erred by applying an incorrect legal standard when denying defendant's request to reduce the theft to a misdemeanor and strike the enhancement. (§ 17, subd. (b).)

Thirteenth, defendant contends the trial court erred by denying him probation. Fourteenth, defendant asserts the cumulative effect of the foregoing alleged errors requires reversal. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Chris Sorenson (Sorenson) worked in Orange County for TMG Financial Services, Inc., which does business as The Mortgage Guild. In 1997, Sorenson opened a Norco branch of the office. The Norco branch was called The Mortgage Guild Sorenson Financial. In 1999, Sorenson opened another office, TMG Escrow. Sorenson then opened a third office, a real estate division, known as Golden Circle Realty. The offices were all divisions of the same corporation, TMG Financial Services, Inc. TMG

3

Escrow (TMG) was supposed to service the real estate and mortgage transactions of Golden Circle Realty and The Mortgage Guild Sorenson Financial.

In 2000 or 2001, Katie Boesen (Boesen) began working as the escrow officer for TMG. Boesen and Sorenson agreed to share the profits of TMG. Sorenson took 60 percent of the profits, and Boesen took 40 percent. Boesen did not believe the profit-sharing arrangement gave her an ownership interest in TMG. Soon after Boesen started as the escrow officer, she received a call from a bank indicating TMG's bank account was overdrawn by $86,000. After an audit, it was discovered someone had embezzled from the company.[2]

In January 2002, Wilhelmina Gunn (Gunn) started working as Boesen's assistant. Upon starting at TMG, Gunn discovered "[t]he whole escrow department was out of whack," with "a lot of unbalanced" accounts.

Defendant was a TMG customer. He placed escrow orders with TMG in his capacity as a real estate agent and loan officer.

In November or December 2002, TMG handled the escrow on the sale of a home belonging to Sandra Ihnken (Ihnken). The buyers paid and the sale closed. Ihnken should have received $124,936.78 as the proceeds of the sale. However, before the proceeds of the sale could be distributed from the escrow account to Ihnken, Ihnken died. Boesen told Sorenson about Ihnken's death. Sorenson instructed Boesen to keep the money in the escrow account until Ihnken's heirs could be located.

---

[2] Approximately $123,000 was embezzled from TMG. The person responsible for that embezzlement was convicted.

4

In March 2003, Sorenson hired an auditor, Pam Strickland (Strickland), to audit TMG to determine if TMG was in compliance with the applicable laws and regulations. During the audit, Boesen told Strickland about the money from the Ihnken sale that was being held. Strickland told Boesen that it was Boesen's responsibility to locate Ihnken's heirs. Strickland told Boesen that there could be a civil lawsuit if TMG held the money and made no efforts to locate the heirs. Strickland found other, additional, problems at TMG. After Strickland left, Boesen had someone leave Boesen's business card at Ihnken's home address, in an attempt to locate the heirs.

Boesen was overwhelmed by the volume of work at TMG. Sorenson informed Boesen that Strickland would be returning to the TMG office around April 2003. This news caused Boesen to be concerned for her job because she had not yet found Ihnken's heir or fixed the other problems discovered by Strickland. For example there were still approximately 100 unbalanced accounts. During the March and April 2003 time period, Boesen was abusing methamphetamines. Due to the methamphetamine abuse, Boesen experienced paranoia.

Boesen spoke to Gunn about (1) finding a way to stop Strickland from returning to TMG, and (2) what to do with the Ihnken money. Defendant was present during one of Boesen and Gunn's conversations about the Ihnken money. Boesen explained the problem to defendant. Later, during a different conversation, defendant told Boesen he was planning to open his own real estate agency, Zerimar Realty. Boesen or defendant suggested a plan of wiring the Ihnken money to defendant, in order to remove it from

5

TMG's accounts.[3] Defendant planned to use the Ihnken money to gain Federal Housing Administration (FHA) approval for Zerimar Realty, because the FHA required a certain balance of funds in the bank in order to obtain approval. Thus, defendant and Boesen would both benefit from the Ihnken money being wired to defendant—defendant could make it appear as though he had sufficient funds for FHA approval, and Boesen could remove the Ihnken money from TMG's accounts and close the account before Strickland returned.

Defendant told Boesen "[s]everal times" that he would not spend the Ihnken money, and assured Boesen the money would be returned to TMG as soon as Ihnken's heir appeared. As part of the plan, after the money was wired, defendant would (1) give Boesen or Gunn $5,000 to balance some of the other TMG accounts that were unbalanced, and (2) give Boesen and Gunn $3,500 each for their involvement in the money wiring plan.

Even with the $12,000 given to Boesen and Gunn, Boesen expected defendant to return the entire $124,936.78. Boesen described the $12,000 as "interest," but said the $124,936.78 was not a loan from TMG. Boesen explained the $12,000 was a "charge" to defendant for Boesen and Gunn allowing defendant to use trust/escrow money. Boesen believed it was clear to defendant that the $124,936.78 was trust money and that it had to be returned if the beneficiary were to appear.

---

[3] Boesen recalled the plan being suggested by defendant. Gunn recalled the plan being suggested by Boesen.

On April 28, 2003, the plan was executed. Gunn filled out the wire form and Boesen signed it. Gunn faxed the form to the bank. The amount of $124,936.78 was wired into defendant's account. The money was labeled as "'Borrower proceeds'" and referenced escrow account number 2281; 2281 was not Ihnken's account number and was not linked to any other account at TMG. Boesen asserted the reference should have read "seller's proceeds," since Ihnken was the seller in her transaction.[4]

The following day, defendant gave Gunn a money order or cashier's check for $5,000. Gunn took the money order or check to her bank, deposited it into her account, and then took out money orders for the specific escrow accounts that were unbalanced. Gunn then gave those money orders to Boesen so she could balance the different accounts. For example, one account was short $227.54, so Gunn took out a money order in that amount to zero-out the account. Defendant also gave Gunn and Boesen checks for $3,500.

On the day of the $124,936.78 wire transfer deposit, defendant's account had a negative balance of $-666.39. After the $124,936.78 deposit cleared, defendant made a series of withdrawals or payments from the account. On June 1, 2003, the balance in defendant's account was $46,394.

On June 9, 2003, Ihnken's granddaughter called TMG and spoke to Gunn. The granddaughter then went to TMG's office with an attorney and Ihnken's death certificate, and requested disbursement of the Ihnken money. Boesen called defendant

---

[4] "Borrower's proceeds" is used when a person refinances his/her property.

and told him Ihnken's heir had been located. Defendant told Boesen he spent the money and therefore could not return it to TMG. On June 13, Boesen used money from other trust/escrow accounts to pay Ihnken's heir.

In an attempt to have defendant repay the money, Boesen spoke to defendant's family members. Boesen also spoke to a loan officer, who referred her to an attorney, Tamara Wagner (Wagner). In 2003, Wagner was a criminal defense attorney. Boesen contacted Wagner. Boesen explained money had been wired to defendant and needed to be returned. Boesen hired Wagner in order for Wagner to contact defendant and have him return the money—the district attorney had not yet filed a case.

On September 15, 2003, Wagner called defendant. Wagner explained that Boesen needed defendant to return the Ihnken money. Defendant promised to repay the money. Defendant said he had "some deals closing in the next couple of days and that as soon as those deals closed, he would wire 40[]to $50,000 back to Miss Boesen." Defendant said he would contact Wagner on September 17, but he did not contact her that day. Wagner tried contacting defendant 11 times over the following three months. On the eleventh try, in December 2003, Wagner spoke to defendant. During that conversation, defendant did not agree to repay the money.

In November 2003, Boesen lost her job at TMG due to her failings at work. Boesen's work performance suffered due to her methamphetamine abuse and "many [other] reasons." At that time, Sorenson was unaware of the situation with the Ihnken money. Sorenson learned about the Ihnken situation in April 2004. Sorenson contacted

Boesen. Boesen said defendant wanted to invest the money, so defendant and Boesen would make profits on the money, "and nobody would know about it."

Sorenson contacted defendant several times and asked him to repay the money. Defendant did not give the money to Sorenson. Sorenson contacted the police on May 25, 2004. In May 2005, at the request of a district attorney's office investigator, Heidi Chebahtah (Chebahtah), Sorenson again contacted defendant to request payment. Defendant did not pay Sorenson. The district attorney filed charges against defendant in June 2005. In April 2007, defendant paid Sorenson $108,936.78.

Sorenson testified that Boesen was not a partner in TMG or an owner of TMG. Irma Dixon, a real estate agent at Golden Circle Realty in 2002, testified that it was commonly known among the employees of TMG, The Mortgage Guild, and Golden Circle Realty that Sorenson was the owner of the three companies. Dixon was defendant's wife's aunt.

Vickie Flores, another of defendant's wife's aunts, testified at the trial. Flores worked as a real estate agent at Golden Circle Realty in 2001 and 2002. As a real estate agent, Flores used TMG's escrow services. Flores never thought of Boesen as an owner of TMG, and Flores did not believe Boesen held herself out as an owner of TMG. Flores believed it was common knowledge among her coworkers that Sorenson owned TMG.

In 2005, in connection with the Ihnken money, Boesen pled guilty to grand theft in the amount of $124,936. Boesen agreed to testify in defendant's case, and was told she could face perjury charges if she lied—Boesen was not given immunity. Boesen

9

was placed on probation, but committed another theft while on probation. Boesen pled guilty to the second theft and was sentenced to prison. At the time Boesen testified in defendant's case, she was homeless.[5]

The prosecution presented two theories of the case: (1) defendant aided and abetted Boesen and Gunn in embezzling the Ihnken money, and (2) defendant took the Ihnken money under false pretenses. Defendant argued the embezzlement theory failed because the prosecution failed to show Boesen and Gunn intended to deprive Ihnken's heir of the use of the money. As a result, defendant contended there was no crime of embezzlement for him to aid and abet. As to false pretenses, defendant argued Boesen loaned him the Ihnken money. Thus, there were no false pretenses; he simply failed to repay a loan, which is a civil matter, not a crime. Thus, under both theories, the dispute at trial concerned only intent.

In support of his loan theory, defendant presented evidence reflecting that Boesen held herself out as an owner of TMG. Leticia Valizan, one of defendant's wife's aunts, began working for The Mortgage Guild in 1998 or 1999. Valizan met Boesen in 2000. Boesen told Valizan that she (Boesen) was part owner of TMG, but Boesen and Sorenson were not telling people Boesen was a partial owner. Valizan had seen Boesen sign Sorenson's name on checks. Valizan believed Boesen was a partial owner of TMG.

---

[5] Gunn pled guilty to grand theft (§ 487, subd. (a)), which was determined to be a misdemeanor (§ 17, subd. (b)).

Defendant also presented the testimony of Yvette Brown. Brown's friend was a loan processor who worked for Sorenson. In 2001 and/or 2002, when Brown visited her friend at the office, Brown would speak with Boesen. Boesen told Brown that she (Boesen) was part owner of TMG. Brown believed Boesen was a partial owner of TMG.

Chebahtah testified as a defense witness. As part of her investigation, Chebahtah spoke to Strickland. Strickland told Chebahtah that she (Strickland) went to TMG's office, but was not retained and did not look at any records. Strickland also said "she would never tell someone they would have to get money out of the trust account[.]"

Two stipulations were provided to the jury. The first stipulation reflected, "Records of the California State Department of Real Estate show that the business known as Zerimar . . . Realty opened on May 2nd, 2003." The second stipulation reflected that on November 16, 2006, defendant deposited $124,936.78 into his attorney's client trust account; and on April 24, 2007, Sorenson received a payment of $108,936.78 from that client trust account.

## DISCUSSION

A.    SUBSTANTIAL EVIDENCE—EMBEZZLEMENT

Defendant contends substantial evidence does not support the finding that he committed grand theft by aiding and abetting in Boesen's embezzlement. Specifically, defendant asserts the only evidence for the mens rea element comes from the

11

uncorroborated accomplice testimonies of Boesen and Gunn, which defendant asserts is insufficient.**6**

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Accomplice testimony must be corroborated. (§ 1111.) Multiple accomplices, such as Gunn and Boesen, cannot corroborate one another. (*People v. Jehl* (1957) 150 Cal.App.2d 665, 668.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider

---

**6** In the instant case, the trial court failed to instruct the jury on the law of accomplice testimony, which is an error we will address *post*.

12

and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Defendant's focus is on the second element. Defendant asserts the only evidence establishing the mens rea element is uncorroborated accomplice testimony, which would be insufficient, since accomplice testimony must be corroborated.

Our Supreme Court has set forth "the standard by which the sufficiency of corroborating evidence is to be measured: 'To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation omitted.] "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citations omitted.] . . . "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citations omitted.]' [Citation.]" (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1206.)

Our initial examination of the evidence will be conducted without reference to the accomplices' testimony. Sorenson testified that he opened and operated TMG. Sorenson also testified that $124,936.78 was left in TMG's escrow account after

13

Ihnken's death.  Sorenson said he told Boesen to hold the money in the escrow account until Ihnken's heir could be located.

Exhibit No. 1 reflects a $124,936.78 wire transfer from TMG's bank account to defendant's bank account on April 28, 2003.  Sorenson testified that the reference number "2281" on the wire transfer order did not reference any account at TMG.  Sorenson explained that he did not authorize the wire transfer to defendant and did not authorize loaning escrow funds to third parties who were not connected to the escrow transaction.  Sorenson also testified that he never discovered a loan contract when investigating the wire transfer.

Exhibit No. 5 is a $5,000 money order for Gunn dated April 29, 2003.  Defendant's bank statement reflects a $5,000 withdrawal on the date the money order was issued.  Sorenson and Wagner testified that they tried to collect the $124,936.78 from defendant, but he refused to repay the money.

From the foregoing evidence, without any consideration to Boesen's or Gunn's testimonies, there is substantial evidence supporting the finding that the third element has been satisfied—that defendant assisted in the achievement of the crime.  Specifically, the foregoing evidence reflects defendant permitted his account to be used as a depository for the ill-gotten Ihnken funds, and that defendant then used the funds to give money to Gunn.  Defendant's bank statement reflects he then continued to use the money.  In addition to the $5,000 withdrawn for Gunn on April 29, there was a separate $15,000 withdrawal the same day.  Thus, there is independent evidence supporting a finding on the third element of aiding and abetting.

In regard to the first element of aiding and abetting—the act by the direct perpetrator—Boesen testified she entered a guilty plea in connection with taking the Ihnken money. That testimony was corroborated by a preliminary agreement related to Boesen's plea. Thus, the first element was also corroborated, because the jury could find there was a crime committed by the direct perpetrator.

In sum, the third element of aiding and abetting can be established without reference to accomplice testimony and the first element is corroborated. Based upon these two factors alone, the jury could connect defendant with the commission of the offense in such a way as to be reasonably satisfied that Boesen and Gunn were telling the truth when testifying about the mens rea aspect of the crime. In other words, there is sufficient corroboration of Boesen's and Gunn's versions of the events that they could reasonably be found to be credible regarding the mens rea element. As a result, defendant's argument that there is not sufficient corroboration is unpersuasive.

Nevertheless, there is circumstantial evidence corroborating the accomplice testimony on the mens rea element. The mens rea element requires knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends. (*People v. Perez*, *supra*, 35 Cal.4th at p. 1225.) The wire transfer document reflects Gunn and Boesen had defendant's bank account information prior to the money being wired. A juror could reasonably infer from Gunn and Boesen having defendant's bank account number for the wire transfer that defendant was involved in the plan prior to the money being transferred.

15

Additionally, the money transferred to defendant matched, to the penny, the amount in Ihnken's escrow account. This evidence supports an inference that defendant did not request a loan, because it would have been odd for defendant to request a loan in the exact amount of the Ihnken escrow account. Rather, it supports the idea that defendant was planning to take all the Ihnken money.

A juror could also reasonably infer from the $5,000 money order for Gunn that a loan was not taking place, because $5,000 is not often returned to a lender the day after a loan is received. Further, Sorenson's testimony that (1) he did not authorize the transfer, and (2) did not allow loans from escrow accounts, supports the inference that it was unlikely this was a loan.

In sum, the circumstantial evidence reflects (1) defendant was involved in the wire transfer from the beginning, (2) defendant targeted all the unclaimed money in the Ihnken account, (3) defendant returned $5,000 to Gunn, rather than TMG, which is odd for an "on the books" transaction, and (4) loans from trust accounts simply did not take place at TMG. From this circumstantial evidence, the jury could reasonably infer defendant had a criminal intent and knowledge because the circumstances are not those that surround legitimate business transactions. For instance, (1) people do not typically take out loans for the exact amount of unclaimed money in a deceased person's account, and (2) people typically do not return $5,000 to an escrow officer's assistant, as opposed to the company (TMG), the day after the loan is issued. This circumstantial evidence supports the accomplice testimony offered by Boesen and Gunn on the mens rea requirement.

16

The testimony from Boesen and Gunn reflects Boesen or defendant suggested a plan of wiring the Ihnken money to defendant, in order to remove it from TMG's accounts. Defendant planned to use the money to gain FHA approval for Zerimar Realty, because the FHA requires a certain balance of funds in the bank in order to obtain approval. Thus, defendant and Boesen would both benefit from the Ihnken money being wired to defendant—defendant could make it appear as though he had sufficient funds for FHA approval, and Boesen could remove the Ihnken money from TMG's accounts and close the account before Strickland returned.

Defendant told Boesen "[s]everal times" that he would not spend the Ihnken money, and assured Boesen the money would be returned to TMG as soon as Ihnken's heir appeared. As part of the plan, defendant gave (1) Gunn $5,000 to balance some of the other TMG accounts that were unbalanced, and (2) Boesen and Gunn $3,500 each for their involvement in the money wiring scheme. Boesen explained the $12,000 was a "charge" to defendant for Boesen and Gunn allowing defendant to use trust money.

On the day of the wire transfer deposit, defendant's account had a negative balance of $-666.39. After the $124,936.78 deposit cleared, defendant made a series of withdrawals or payments from the account. On June 1, 2003, the balance in defendant's account was $46,394.

The foregoing evidence, which is derived from sufficiently corroborated accomplice testimony, reflects knowledge of the direct perpetrator's unlawful intent because the money was wired for the purpose of removing it from Ihnken's account. Further, defendant knew the money needed to be returned when an heir appeared. This

17

means he likely knew he should not have the money—that the money was illegally obtained. Thus, with the circumstantial evidence and corroborated accomplice testimony there is substantial evidence of defendant's knowledge of Boesen's unlawful intent.

As to defendant's intent to assist in achieving those unlawful ends, the exhibits reflect the circumstantial evidence that defendant provided his bank account information to Gunn and Boesen for purposes of providing a depository for the Ihnken funds. Additionally, the exhibits reflect defendant withdrew $5,000 from his account to give to Gunn. The accomplice testimony reflects defendant gave an additional $7,000 to Boesen and Gunn for their roles in the illegal activity. The foregoing documentary evidence and corroborated accomplice testimony constitute substantial evidence of defendant's intent to assist Boesen in achieving her unlawful ends. In sum, substantial evidence supports defendant's grand theft conviction on a theory of aiding and abetting Boesen's embezzlement.

B.      SUBSTANTIAL EVIDENCE—FALSE PRETENSES

Defendant contends substantial evidence does not support the finding that he committed grand theft by means of false pretenses.

When a prosecutor argues alternative theories for convicting a defendant, the conviction may stand if there is sufficient evidence supporting one of the theories, absent any indication the verdict actually rests on the other theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) The prosecutor in the instant case argued both (1) aiding and abetting embezzlement, and (2) false pretenses. One theory was not stressed more

18

than another, they were presented as viable alternative options.  No questions were submitted by the jury.  Thus, there is no indication that the jury was favoring one theory more than another.

Since there is substantial evidence supporting the aiding and abetting embezzlement theory of the case, we do not address whether there is also substantial evidence supporting the alternative false pretenses theory.  The verdict can properly rest on the aiding and abetting theory.

## C.    ACCOMPLICE TESTIMONY

Defendant contends the trial court erred by failing to instruct the jury that accomplice testimony must be viewed with caution and be corroborated.  (CALCRIM No. 335.)  The People concede the trial court erred by not giving the instruction, but assert the error was harmless because there was sufficient corroboration for Boesen's and Gunn's testimonies.

When there is substantial evidence that a witness was the defendant's accomplice, and that witness implicated the defendant in a crime, then the trial court has a sua sponte duty to instruct the jury on the law of accomplice testimony.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)  The instruction should reflect the "accomplice's testimony implicating the defendant must be viewed with caution and [be] corroborated by other evidence.  [Citation.]" (*Ibid.*)  "An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes.  [Citations.]" (*Id.* at p. 1224.)

Boesen and Gunn pled guilty to grand theft in connection with the Ihnken money. Therefore, as the People concede, they were defendant's accomplices and since their testimonies could be interpreted as implicating defendant, the trial court should have instructed the jury on the law of accomplice testimony.

The error of failing to give an accomplice testimony instruction will be deemed harmless if the accomplice's testimony was sufficiently corroborated. (*People v. Boyer* (2006) 38 Cal.4th 412, 467.) As explained *ante*, there is sufficient evidence corroborating Boesen's and Gunn's testimonies. Therefore, we conclude the trial court's error in failing to give the accomplice testimony instruction was harmless.

D.     COCONSPIRATOR TESTIMONY

Defendant asserts the trial court erred by denying his request to instruct the jury on the law of coconspirator testimony. (CALCRIM No. 418.) The People assert the trial court did not err by denying defendant's request because (1) statements were not admitted pursuant to the coconspirator hearsay exception (Evid. Code, § 1223), and (2) the prosecution did not argue a conspiracy theory.

The coconspirator instruction informs the jury that, in deciding whether the prosecution has met its burden, the jury "may not consider any statement made out of court by [a coconspirator] unless the People have proved by a preponderance of the evidence that: [¶] 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. [The coconspirators were] members of and participating in the conspiracy when (he/she/they) made the statement; [¶] 3. [The coconspirator(s)] made the statement in order to further

the goal of the conspiracy; [¶] AND [¶] 4. The statement was made before or during the time that [the defendant was] participating in the conspiracy." (CALCRIM No. 418.)

Requested instructions should be given when they comport with the evidence and theories being argued at trial. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) A trial court may refuse to give a requested instruction if the instruction has the potential to confuse the jury. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) We review alleged instructional errors de novo. (*Ibid.*)

Arguably, the evidence in this case supported a finding of a conspiracy between Boesen and defendant. However, defendant was not charged with conspiring. (§ 182.) Thus, the prosecutor was not arguing conspiracy and defendant certainly was not arguing he was part of a conspiracy. Thus, no one presented a theory related to conspiracy. Additionally, statements were not introduced pursuant to the conspiracy hearsay exception, so there was not a procedural basis for discussing conspiracy.

The conspiracy instruction would have been more confusing than helpful to the jury given (1) the theories and procedure of the case did not focus on conspiracy; and (2) the instruction requires conspiracy findings, for example that the members were participating in a conspiracy. The jury likely would have been confused regarding the conspiracy findings when no argument would have been offered regarding whether a conspiracy occurred. The proper and more on-point instruction was the accomplice instruction (CALCRIM No. 335), which, as discussed *ante*, was not given but the error was harmless. Accordingly, we conclude the trial court was correct in not giving the coconspirator instruction.

21

E.      SPEEDY TRIAL

1.      *PROCEDURAL HISTORY*

The complaint against defendant was filed on June 6, 2005.  Defendant was arraigned on June 16, 2005.[7]  The preliminary hearing took place on July 24, 25, and 26, 2006.  The information was filed on August 8, 2006.  Gunn and Boesen were included as defendant's codefendants.  The information arraignment occurred on August 9, 2006.

Defendant's trial was scheduled for March 30, 2009.  On March 30, the court ordered defendant's trial to trail until April 8. The attorneys stipulated that April 9 would be the last day for trial to commence.  On April 8, the trial court addressed the motion of Gunn's attorney, Gregory Comings (Comings), for a continuance.  (§ 1050.)  Comings explained he had been in trial in Corona, and was awaiting a trial in West Covina.  The judge in West Covina wanted Comings to be available on April 13.  Comings told the court in the instant case, although not in the motion, that he was unprepared for trial because he had been preparing for the West Covina case.  Comings also said he was busy with a personal matter that he did not want to disclose to the court, which would cause him to be unavailable on April 9.

The prosecutor said the prosecution was experiencing "some witness problems."  Specifically, Chebahtah and Wagner were scheduled to be out of town on vacation, and

---

[7] On September 6, 2012, this court took judicial notice of the record in Court of Appeal case *Ortiz v. Superior Court of Riverside County* (June 22, 2009) E048385. (Evid. Code, § 452, subd. (d).)

were not subpoenaed. Thus, the prosecutor did not object to Gunn's motion to continue the trial date.

Defendant's counsel argued that Gunn's attorney failed to show good cause for the continuance because he was not in trial, he was only awaiting trial. Defendant's counsel also asserted there was not good cause to continue the case based upon the prosecution's witnesses' vacations because the prosecution should have subpoenaed the witnesses.

The trial court, presided over by Judge Webster, found there was not good cause to grant Gunn's continuance. The trial court explained there was not good cause because (1) Comings could quickly be prepared for the case, because "it is such an old case"; (2) Comings appearance in West Covina could be rescheduled since the instant case would be called before the West Covina case; and (3) the district attorney's office was negligent in failing to issue the necessary subpoenas.

The trial court said, "And so I'll go ahead and continue the matter and, [defendant's trial counsel], you heard my statement. I wouldn't find good cause, which sets you up for dismissal." The trial court continued the trial until June 8, with the last day being June 18. On April 15, defendant filed a motion to dismiss due to his speedy trial rights being violated.

The trial court heard the motion to dismiss on April 21. Comings was not present for the hearing. Another attorney, Ms. Corcoran, said Gunn's case was "being reassigned," so Comings would not be appearing.

23

The prosecutor explained the subpoena problem. The prosecutor said he believed the trial was going to be trailed until April 6. The prosecutor subpoenaed Wagner for April 6. Wagner told the prosecutor she was going on vacation on April 10. The prosecutor told Wager her testimony would be completed before her vacation. Chebahtah was subpoenaed for the March 30 trial date. Chebahtah e-mailed the prosecutor prior to March 30 asking if she needed to be ready for trial. The prosecutor told Chebahtah he would "'let [her] know.'" The prosecutor never followed-up with Chebahtah, so Chebahtah left for training in Chicago. The prosecutor did not follow-up with Chebahtah about the April 8 trial date because Comings had indicated he needed a continuance, so the prosecutor assumed the case would be continued or trailed. The prosecutor discovered at 4:00 p.m. on April 7 that Chebahtah had left for her training.

Defendant's trial attorney (Cohen), argued there was not good cause for the continuance because there was no evidence Comings had been in trial or otherwise engaged on April 8. As to the People, Cohen argued there needed to be evidence reflecting the prosecutor's diligence. Cohen said he would accept the prosecutor's representations, but Chebahtah needed to provide testimony regarding her availability and whether she could have appeared for trial.

The trial court, again presided over by Judge Webster, described this as "an odd situation," because the prosecution's and Gunn's situations, when considered individually, did not constitute good cause; however, the court believed that when the prosecution's and Gunn's situations were combined there might be good cause. The court concluded there was good cause for the continuance based upon the

24

"combination" and "interaction" of Gunn's and the prosecution's situations. The court explained the prosecutor reasonably relied on Coming's statement that the case would be continued, so the prosecutor acted in good faith in regard to scheduling Wagner and Chebahtah. However, the trial court, in discussing Cohen's request for evidence related to Chebahtah, said, "It's clear that that evidence is not there." The trial court denied defendant's motion to dismiss.

In its conclusion, the trial court encouraged defendant to petition this court for a writ. The trial court said, "[F]rankly, on a case like this I would welcome guidance by the Court of Appeal, because I don't have a clear understanding of what is right and wrong, and it would be nice for them to give guidance for the future."

On May 19, 2009, defendant petitioned this court to issue a writ (1) vacating the trial court's denial of defendant' motion to dismiss, and (2) ordering the trial court to grant defendant's motion. This court requested a response from the district attorney, which the district attorney provided. On June 22, 2009, this court summarily denied defendant's writ petition.

> 2.     *ANALYSIS*

Defendant asserts he was denied his right to a speedy trial. The People assert defendant failed to establish prejudice. Defendant contends he should not be required to establish prejudice because this court should decide the issue as though it were a pretrial matter due to this court not addressing the merits of the issue when Ortiz filed his writ petition—this court summarily denied the petition.

When a defendant asserts a statutory speedy trial violation prior to trial, the defendant is not required to make an affirmative showing of prejudice. (*People v. Martinez* (2000) 22 Cal.4th 750, 769.) However, if the alleged speedy trial violation is raised after trial, on appeal, then prejudice must be shown because the state Constitution prohibits reversal on appeal unless there has been a prejudicial error. (*Ibid*.) If a defendant filed a writ petition prior to trial concerning a statutory speedy trial violation, then, on appeal, the prejudice requirement still applies—the prejudice standard is not removed on appeal simply because a defendant filed a pretrial writ petition. (*People v. Booker* (2011) 51 Cal.4th 141, 157.)

Defendant has not made an affirmative showing of prejudice. Defendant's argument is that we should review the matter as though it is a pretrial issue, since we did not issue a substantive opinion in response to the writ petition. We must follow Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455-456 (*Auto Equity*).) Thus, an affirmative showing of prejudice is required on appeal despite defendant having filed a pretrial writ petition. (*People v. Booker*, *supra*, 51 Cal.4th at p. 157.) Since defendant has not made an affirmative showing of prejudice, we find his argument related to the speedy trial issue to be unpersuasive.

F.      WHOLE CONVERSATION

1.      *PROCEDURAL HISTORY*

On direct examination, Sorenson testified that he contacted defendant several times in 2004 and "begged" defendant to repay him. Defendant "said he would," but

defendant did not repay the money in 2004. In May 2005, at the request of Chebahtah, Sorenson again contacted defendant to request payment. Defendant did not pay Sorenson in 2005.

During defense counsel's cross-examination of Sorenson, the trial court took a recess. During the recess, defense counsel (Cohen) asserted the "door [had] been opened" to question Sorenson about Ortiz's responses to Sorenson's demands for payment. Defendant cited the whole conversation rule, which provides that when a segment of a conversation has been introduced the remaining portion of the conversation may be introduced in order for the original segment to be properly understood. (Evid. Code, § 356.)

The trial court asked Cohen to explain how Sorenson's testimony was ambiguous, such that other portions of the conversation needed to be introduced. Cohen said he wanted to present testimony that defendant told Sorenson he (defendant) believed (1) Boesen was a partial owner of TMG, (2) Boesen wanted to invest in Zerimar Realty, and (3) defendant had one year to repay the money he received from Boesen. Cohen asserted those statements from defendant would explain Sorenson's testimony about defendant's and Sorenson's conversation wherein Sorenson demanded payment, but defendant did not repay the money. Cohen asserted defendant's explanation as to why defendant was not repaying the money was relevant to understanding Sorenson's testimony.

The trial court said, "Actually, it's contradictory to the discussion. I don't know why, counsel, it's not logical that he would say[,] 'I borrowed money from Ms. Boesen,

27

her separate funds, and now I promise to repay that money to you, Mr. Sorenson.' [¶] That's an illogical inconsistency. That does not explain anything."

        2.      *ANALYSIS*

Defendant asserts the trial court erred by excluding evidence of conversations between defendant and Sorenson because the "whole conversation" rule should have been applied. (Evid. Code, § 356.)

"Trial court rulings on the admissibility of evidence are reviewed for abuse of discretion. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 577.) Evidence Code section 356 provides, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "'The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 460.)

The issue we address is whether Sorenson's testimony left the jury with a mistaken impression about the conversation. Sorenson said he spoke to defendant, asked defendant to repay the money, defendant said he planned to repay the money, but defendant did not repay the money in 2004 or 2005. This information about the conversation is consistent with the information defendant sought to present. Thus, there was not a mistaken impression.

Defendant wanted Sorenson to testify that defendant told Sorenson defendant believed (1) Boesen was a partial owner of TMG, (2) Boesen wanted to invest in Zerimar Realty, and (3) defendant had one year to repay the money he received from Boesen. Sorenson testified that defendant said he would repay Sorenson. This testimony is consistent with the theory that defendant believed Boesen was a partial owner of TMG along with Sorenson. If defendant agreed to repay Sorenson, as though Boesen and Sorenson were one-in-the-same, that supports a finding that defendant believed TMG was the source of the funds and Boesen gave defendant the money in her supposed role as co-owner of TMG. Thus, there was not a mistaken impression concerning defendant's belief that Boesen was co-owner of TMG.

Next, Sorenson's testimony that defendant promised to repay the money is also consistent with the idea that the money was loaned to defendant. So there was nothing inconsistent in Sorenson's testimony that would have left the jury with a misperception of the conversation that needed to be clarified by further context. Sorenson's testimony was consistent with the information that defendant sought to present. Since the information was consistent and a misimpression was not created, we conclude the trial court did not err.

Nevertheless, to the extent an error could be found, the error would be harmless. When "a trial court commits an evidentiary error, 'the applicable standard of prejudice is that for state law error, as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . (error [is] harmless if it does not appear reasonably probable [the] verdict was affected).' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 20.)

While testifying, Boesen referred to the $12,000 defendant gave to Boesen and Gunn as "interest." Sorenson testified that Boesen told him she loaned the money to defendant. Sorenson told a sheriff's investigator about Boesen's statement regarding the loan to defendant. Thus, there was evidence in the record about the Ihnken money being loaned to defendant. Arguably, the evidence in the record was stronger since it came from a source other than defendant. The evidence was stronger because it would not appear to be a self-serving statement. However, the jury still rejected the idea that the money was loaned to defendant. Given this evidence and the jury finding, we conclude it is not reasonably probable the verdict was affected by the alleged error.

### G.    REFRESHED RECOLLECTION

#### 1.    *PROCEDURAL HISTORY*

During the prosecutor's direct examination of Sorenson, the prosecutor used (1) a May 2004 sheriff's report; and (2) a follow-up sheriff's report from July 2004, to refresh Sorenson's recollection. The May 2004 report was used to remind Sorenson of the exact date when he contacted law enforcement about the Ihnken money. The July 2004 follow-up report was used to remind Sorenson of the approximate date when he made the follow-up report. The prosecutor declined to have the reports marked for identification.[8]

During Cohen's cross-examination of Sorenson, Cohen asked, "Now, after you spoke to Investigator Jordan and complained or raised this issue about this $124,000,

_____

[8] This means the reports are not part of the record on appeal.

Investigator Jordan closed the case as a, quote, civil matter. Correct?" Before Sorenson answered, the trial court instructed counsel to approach the side bar. Outside the presence of the jury, the trial court said, "All actions of the Sheriff's Department as far as their characterization of this dispute are not relevant and there will be no questions about what the Sheriff's Department did or did not do regarding this case."

Cohen agreed the sheriff's actions were "not relevant." However, Cohen asserted the sheriff's actions could explain why Sorenson made certain statements. Cohen argued that once Sorenson learned the sheriff closed the case as a civil matter, then Sorenson was "in a position where either he has to start litigation and pay a lawyer [to collect the lost money] or find a lawyer to do it on contingency or he has to make this case into a criminal case." Essentially, Cohen asserted the sheriff's actions explained Sorenson's motive for lying about the money being stolen, when in reality, the money was lost through a loan that was not repaid. Cohen explained, "His motivation is to have restitution paid or obtained through a criminal prosecution. You don't have to get a lawyer. You don't have to go through civil litigation. It happens all the time."

The trial court said, "So his conduct and his thinking was not changed at all. He's been consistent that he thought it was a criminal matter from the start. He did not change. [¶] If you can establish that he's changed his story about something, feel free to go do that, but you're going to do that without reference to the Sheriff's Department closing this case out at one time as a civil matter. End of story."

Later, after the trial court ruled Cohen could not question Sorenson about defendant's comments concerning the money being a loan pursuant to the whole conversation rule (Evid. Code, § 356), Cohen argued the two sheriff's reports were used to refresh Sorenson's recollection, and therefore Cohen should be permitted to question Sorenson about the entirety of those documents. (Evid. Code, § 771, subd. (b).)

Cohen asserted the May 2004 report included information about the investigation being closed due to the dispute being a civil matter. The trial court said, "No. 771 does not change the admissibility of what's in those police reports." The trial court denied Cohen's request to question Sorenson about the content of the police reports.

2.    *ANALYSIS*

Defendant contends the trial court erred by not permitting Cohen to question Sorenson about the content of the sheriff's reports pursuant to Evidence Code section 771, subdivision (b).[9]

---

[9] Evidence Code section 771, subdivision (b) provides that if a party uses a writing to refresh a witness's recollection, and the writing is produced at the hearing, then "the adverse party may, if he chooses, inspect the writing, cross-examine the witness concerning it, and introduce in evidence such portion of it as may be pertinent to the testimony of the witness."

The problem we confront in addressing defendant's contention is the two reports are not part of the record on appeal.[10]  If we were to assume, for the sake of addressing the substantive arguments, that the reports did reflect (1) the substance of Sorenson's and defendant's conversation, (2) the sheriff's recommendation or plan to close the case as a civil matter, and (3) statements Boesen made to the deputies; and if we were to conclude the trial court erred, then we would have no means of assessing whether the error is prejudicial.  If we do not know what is actually in the reports, i.e., if everything is done by assumption, we cannot know whether defendant was truly prejudiced by not being permitted to question Sorenson about the reports.  Any discussion regarding prejudice would be speculation or assumption.  Since speculation cannot support reversal of a judgment, we conclude defendant's argument is unpersuasive.  (*People v. Gray* (2005) 37 Cal.4th 168, 230 [speculation cannot support reversal of a judgment].)

H.     ATTORNEY CONVERSATION

1.     *PROCEDURAL HISTORY*

During pretrial discussions, the court and trial attorneys discussed issues that had arisen during defendant's original trial—the instant case involved defendant's retrial in

---

**10**  The prosecutor could not have requested the reports be admitted into evidence because the prosecutor used the report to refresh Sorenson's recollection.  However, the reports could have been admitted into evidence "at the behest" of defendant.  (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1492; Evid. Code, § 771, subd. (b).)  The prosecutor declined defendant's request to have the reports marked.

this matter.[11]  The prosecutor asserted that, during the first trial, a problem arose regarding Wagner's testimony.  Wagner was the attorney Boesen hired to collect the Ihnken money from defendant.[12]  The prosecutor asserted it would be helpful for the court to rule on whether Wagner's conversations with defendant were privileged, via the attorney/client privilege.

The court asked if Cohen would be raising an objection concerning privilege.  Cohen responded, "I don't know at this point whether I would make that objection."  During trial, prior to Wagner's testimony, Cohen raised an attorney/client privilege objection to Wagner's testimony.  Cohen conceded defendant never retained Wagner and Wagner never indicated to defendant that she was his attorney.  Nevertheless, Cohen asserted the privilege applied because Boesen retained Wagner for the purpose of avoiding criminal prosecution for the theft, thus, defendant could have reasonably believed he had an attorney/client relationship with Wagner to the extent Wagner was helping Boesen, Gunn, and defendant avoid criminal prosecution.

The trial court explained that Wagner made a demand of defendant—that defendant repay the Ihnken money.  The trial court asserted no reasonable person would believe a demand from an attorney was a "counseling session," because Boesen and defendant were adversaries at that point, in that Boesen was demanding money from defendant.  The trial court overruled defendant's attorney/client privilege objection.

---

[11]  Defendant's first trial was a mistrial due to the jury being unable to reach a verdict.

[12]  Wagner is currently a commissioner at the Riverside County Superior Court.

2.    ANALYSIS

Defendant asserts the trial court erred by admitting evidence of defendant's conversations with an attorney, Wagner, because the evidence violated attorney/client privilege.

A client has the privilege to prevent the disclosure of confidential communications that took place between the client and his lawyer.  (Evid. Code, § 954.)  "The privilege 'applies not only to communications made in anticipation of litigation, but also to [the] legal advice [given] when no litigation is threatened.'  [Citation.]" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1207.)  The privilege also applies when the client does not actually retain the attorney, so long as the client was speaking to the attorney "'with a view to employing him professionally,'" i.e., a consultation.  (*Id*. at p. 1208.)  Thus, "client" is defined as "a person who 'consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity [citation]."  (*Id.* at p. 1207.)

Typically, we apply the substantial evidence standard in reviewing the trial court's determination that there was not an attorney/client relationship.  (*People v. Gionis*, *supra*, 9 Cal.4th at p. 1208.)  Under the substantial evidence standard we view the evidence in the light most favorable to the ruling.  (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  Defendant contends we should review the matter de novo, because the facts are not in dispute.  "[T]he application of a statute to undisputed facts is a question of law, subject to [a court's] de novo, or independent, review on appeal.

35

[Citations.]'  [Citation.]"  (*People v. Hernandez* (2009) 177 Cal.App.4th 1182, 1187.)

We will apply the de novo standard as urged by defendant.

On September 15, 2003, Wagner called defendant.  Wagner explained that she represented Boesen and needed defendant to return the Ihnken money.  Defendant promised to repay the money.  Defendant said he had "some deals closing in the next couple of days and that as soon as those deals closed, he would wire 40[]to $50,000 back to Miss Boesen."  Defendant said he would contact Wagner on September 17, but he did not contact her that day.  Wagner tried contacting defendant 11 times over the following three months.  On the eleventh try, in December 2003, Wagner spoke to defendant.  During that conversation, defendant did not agree to repay the money.[13]

In Wagner's initial contact with defendant she said she represented Boesen and demanded payment.  From the outset, Wagner explained that her interests were aligned with Boesen, not defendant.  Further, Wagner demanded money on behalf of Boesen, and defendant then avoided Wagner's multiple telephone calls.  It appears from the evidence that defendant treated Wagner as representing an adverse party since he seemed to be actively avoiding her.  Further, Wagner's actions reflect that she treated defendant as an opposing party—by explaining who she represented and demanding payment from defendant on behalf of her client.  Given the evidence, it does not appear defendant (1) was looking to hire Wagner as his attorney, or (2) that Wagner offered

---

[13] We note the attorney/client privilege objection was ruled upon before Wagner actually testified.  However, defendant delves into Wagner's testimony; therefore in order to address his argument, we will also discuss Wagner's testimony.

36

defendant her legal services. As a result, we conclude there was not an attorney/client relationship and the trial court did not err.

Defendant asserts the "joint defense privilege"[14] is applicable, so the attorney/client relationship between Boesen and Wagner extended to defendant. The joint defense doctrine "operates as an exception to the general rule that a privilege is waived upon voluntary disclosure of . . . privileged information to a third party." (*OXY*, *supra*, 115 Cal.App.4th at p. 888.) Thus, the joint defense doctrine does not operate in the manner defendant needs it to. The doctrine does not draw codefendants into the attorney/client privilege. Rather, it reflects only that the attorney/client privilege was not waived by the attorney's client when a confidential matter is discussed with a codefendant. In other words, the doctrine does not expand the privilege; it would only allow for a waiver to not be found. (*Id.* at p. 889.) Since the doctrine does not operate to bring defendant into Boesen's and Wagner's privileged relationship, we find defendant's argument to be unpersuasive.

I.      MARIJUANA PLANTS

1.      *PROCEDURAL HISTORY*

In the prosecution's pretrial brief, the prosecutor asserted defendant was arrested for an impeachable offense, which the prosecutor would present if defendant testified. Specifically, on July 24, 2008 (approximately three years after the complaint was filed

---

**14** This principle "has been variously referred to as the 'joint defense' doctrine, the 'common interest' doctrine, and the 'pooled information' doctrine." (*OXY Resources California, LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 888 (*OXY*).)

in the instant case), defendant was arrested for unauthorized marijuana cultivation (Health & Saf. Code, § 11358) and possession of marijuana for sale (Health & Saf. Code, § 11359).

Police officers asked defendant if they could search his residence. After initially denying the request, defendant granted the officers permission, saying he possessed only five marijuana plants for medicinal purposes. The officers searched the residence. Officers found 41 marijuana plants, plastic baggies, and electronic scales. The prosecutor asserted, if defendant were to testify, the prosecutor would impeach defendant with (1) the lie defendant told about only having five plants, and (2) the evidence of defendant growing marijuana and possessing marijuana for sale.

Defendant filed a motion to suppress all evidence discovered during the illegal search of his home. Defendant asserted the marijuana evidence should be suppressed based upon the violation of defendant's Fourth Amendment rights.

During trial, outside the presence of the jury, defense counsel (Cohen) requested the trial court issue an advance ruling regarding whether defendant could be impeached if he were to testify, since the marijuana related arrests did not result in a conviction. Defendant was not convicted because it was determined the search was illegal. Cohen asserted, had there been a trial related to the marijuana offenses, he would have presented evidence concerning the lack of cash, weapons, pay/owe sheets, and foot traffic at the house that would have supported a finding of sales taking place. Cohen asserted defendant had a "medicinal use license" for the marijuana and defendant shared

access to the marijuana with two other people were also were licensed to use medical marijuana.

Cohen argued it would be improper for the prosecutor to use the marijuana evidence because had the police done a proper search, defendant could have had a trial and been found innocent. Cohen argued it was problematic that the police did an improper search, thus causing defendant to be denied a trial, and then the prosecutor would use the evidence from that illegal search to impeach defendant. Cohen asserted the government should not benefit from its misconduct in the illegal search. Cohen cited estoppel, laches, and unclean hands as the applicable legal and equitable principles. The prosecutor asserted "[t]he officers made a mistake," but defendant also benefitted from it by not being prosecuted for the marijuana offenses.

The trial court issued the following ruling: "[S]hould [defendant] testify, the People will be allowed to ask him if, on the date in question in 2008, at his residence, were there 41 growing marijuana plants, to which I assume he'll answer yes. That is the only question the People will be allowed to ask on this subject. [¶] Should the Defense choose to expand on the subject and talk about the size of the plants, the nature of the plants, the nature of his medical condition, the existence of a medical card, the existence of other people perhaps in the residence with medical cards—the Defense is free to do all of that. And if they do that, the People may not rebut. We're not going to have a mini trial on this case. [¶] The People get to bring out that on such and such a date there were 41 plants, period, end of story; no evidence for this jury as to who found the plants, what was the condition of the plants. [¶] The Defense gets to put on all their

39

medical marijuana evidence that they wish, their personal use evidence that they wish, and the People do not get to rebut it." Defendant did not testify at trial.

2. *ANALYSIS*

a) <u>Contention</u>

Defendant contends the trial court erred by permitting the prosecutor to impeach defendant with information derived from the illegal search of defendant's house. The People concede the trial court appears to have erred, but assert (1) defendant forfeited the issue by not testifying at trial, and (2) the error was harmless.

We start our analysis with the forfeiture issue. The People contend defendant forfeited the issue for appeal by not testifying at trial. The People rely on the rule that "a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 731 (*Ledesma*); see also *People v. Collins* (1986) 42 Cal.3d 378, 384-385 (*Collins*).) A defendant is typically required to testify to preserve an impeachment issue for review because (1) the error analysis would be speculative without the defendant's testimony, due to the possibility that (a) the trial court may have changed its ruling in response to the actual content of the defendant's testimony, or (b) the prosecutor may not have presented the impeachment evidence based the defendant's testimony; and (2) a prejudice analysis would be speculative if defendant's testimony were not in the record. (*Collins*, at pp. 384-385.)

Defendant asserts the foregoing forfeiture rule is not applicable because the impeachment issue in this case is purely legal, whereas the foregoing rule applies to

40

factual rulings. Defendant relies on an idea set forth by Justice Brennan in a concurring opinion with Justice Marshall. Justice Brennan wrote that in cases "in which the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate." (*Luce v. U.S.* (1984) 469 U.S. 38, 44 (conc. opn. of Brennan, J. and Marshall, J.).)

Justice Brennan's and Marshall's idea was discussed by a California appellate court in *People v. Washington* (1989) 211 Cal.App.3d 207, 213 (*Washington*). In *Washington*, the appellate court noted the rule requiring a defendant to testify, in order to preserve an impeachment issue for review, should not be applicable when "it is obvious what [defendant's] testimony would be." (*Ibid.*) However, the *Washington* court ultimately followed the California Supreme Court's authority in *Collins* and concluded the trial court did not err by postponing its ruling on the defendant's motion to exclude until after the defendant testified. (*Washington*, at p. 214.)

The *Washington* court concluded that postponing ruling on a motion to exclude until after the defendant testified was "not the customary practice" and "should not be encouraged," but it "would exceed [the court's] authority to hold that a California trial judge cannot do that which our own high court and that of the United States have manifestly authorized. (*Auto Equity Sales Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)" (*Washington, supra,* 211 Cal.App.3d at p. 214.) In other words, *Washington* concluded there was not a clear exception for purely legal impeachment issues.

Defendant cites to a recent Hawaii Supreme Court decision, *State v. Schnabel* (2012) 127 Hawaii 432, to support his position. In *Schnabel*, the Hawaii Court discussed the idea that the forfeiture rule "'forces upon an accused what is arguably an unfair choice; testify under circumstances where it is virtually certain the prosecutor will regale the jury with tales of prior convictions, or refrain from testifying, deprive the jury of the accused's side of the story, and lose all chance to appeal.' [Citation.]" (*Id.* at p. 463.) The Hawaii court noted that other states have rejected the forfeiture rule by reasoning that the problem of potentially speculative analysis is unfounded where it is clear from the record what the defendant's testimony would have been. (*Ibid.*) The court concluded the forfeiture rule would not be applied in *Schnabel* because it would have "compelled [the defendant] to make an 'unfair choice.'" (*Id.* at pp. 463-464.)

Defendant has amply demonstrated there are possible flaws in applying the *Ledesma* and *Collins* forfeiture rule in a case where the defendant's potential testimony can be easily predicted from the record. However, as an intermediate appellate court, we are not in the position to disagree with *Ledesma* and *Collins*. (*Auto Equity*, *supra*, 57 Cal.2d at pp. 455-456.) In *Ledesma*, our Supreme Court wrote, "It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify. [Citations.]" (*Ledesma*, *supra*, 39 Cal.4th at p. 731.)

We read our Supreme Court's opinion as creating no room for exceptions, because it appears to be an absolute or "bright-line" rule. As a result, there is no room for this court to create the distinction defendant is urging—that a purely legal

determination (in the circumstance where the defendant's testimony can clearly be predicted from the record) is an exception to the forfeiture rule. (*Auto Equity*, *supra*, 57 Cal.2d at pp. 455-456.) As a result, we conclude the issue has been forfeited because defendant did not testify at trial.

### J. DENIAL OF COUNSEL

#### 1. *PROCEDURAL HISTORY*

During the original trial in this matter, defendant was represented by Cohen, who was privately retained counsel. The trial court declared a mistrial in defendant's and Gunn's first trial on July 31, 2009. In October 2009, Gunn's attorney, Keith Bruno (Bruno), filed a motion to reduce Gunn's felony to a misdemeanor (§ 17, subd. (b)) and strike the enhancement related to taking more than $65,000 (§ 1385). A footnote in the motion reflects defendant joined in Gunn's motion.

The motion focused on Gunn's minor role in the crime and the minor benefit she received from the crime. Bruno asserted Gunn's role and the benefit she received did not amount to a felony. Bruno argued judicial resources would be wasted by a retrial since no new evidence was available. Bruno urged the court to strike the enhancement (§ 1385) concerning taking more than $65,000 from the victim (§ 12022.6), and designate the grand theft offense (§ 487, subd. (a)) a misdemeanor. In Gunn's reply to the prosecution's opposition, Bruno wrote, "The court, having reviewed the transcript and the evidence, has recognized the disparity in culpability between Ms. Gunn and [defendant], and the indicated rulings reflect that balance."

43

In January 2010, Cohen filed a supplemental memorandum in support of the joint motion. In the supplemental memorandum, Cohen asserted defendant had repaid Sorenson/TMG for the money that was taken: $16,000 was immediately returned, and $108,936.78 was returned prior to the first trial. Cohen asserted that since the victim was fully reimbursed, defendant was the least culpable of the three codefendants, since he was not a TMG employee. Defendant asserted Gunn "was little more than a lackey for [Boesen]," but the evidence reflected "multiple aggravating factors" related to Boesen's conduct. Cohen asserted defendant and Boesen should be treated similarly, and that it was illogical for the prosecution to treat Boesen so leniently while defendant was treated so harshly. Cohen asserted defendant's offense should be treated as a misdemeanor.

In March 2010, the trial court held a hearing on the joint motion. Gunn's attorney, Bruno said he was appearing for Gunn and specially appearing for Cohen on behalf of defendant. The court asked if Bruno could appear for both Gunn and defendant. Bruno asserted he could, but requested to segregate the motion in order to make "separate and different arguments" on behalf of defendant.

The court proceeded with the motion as to defendant. Bruno asserted defendant repaid the money to Sorenson, which was "a significant amount." The trial court found the payment of restitution might be relevant at sentencing, but that there was "sufficient evidence for the charges to go forward on a second trial." The court denied defendant's motion "to dismiss or 17(b) the allegation."

The trial court asked Bruno about scheduling a retrial date for defendant. Bruno informed the court Cohen had "not been retained." The court said it would appoint the public defender for defendant. In scheduling the dates, Bruno asked for a date that would give Cohen "time to transfer the file to [the] new counsel." The trial court directed Cohen to deliver his file to the public defender's office and told defendant to contact the public defender's office.

The trial court then addressed Gunn's portion of the joint motion. The court found there was not sufficient evidence to support the enhancement against Gunn concerning taking more than $65,000. (§ 12022.6, subd. (a)(1).) The court struck the enhancement allegation in relation to Gunn. The court reasoned that Gunn "was not a central figure of this conspiracy; that she was at all times an employee of Ms. Boesen . . . she operated under Ms. Boesen's direction at all times . . . ." The court explained that without the enhancement, Gunn could plea to a misdemeanor. Gunn pled guilty to misdemeanor grand theft. (§ 487, subd. (a).)

2.      *ANALYSIS*

Defendant contends he was denied his right to counsel because he did not have an attorney at the time of his wobbler hearing. (§ 17, subd. (b).) Defendant asserts he did not have an attorney at the time of the wobbler hearing because, (1) Cohen had not been retained, thus Bruno could not specially appear for Cohen, and (2) the public defender was appointed after the hearing. "A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including sentencing. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) We will assume, for the

45

sake of judicial efficiency, that a wobbler hearing is a critical stage in a criminal proceeding.

We read the record as reflecting Cohen had been retained for purposes of the wobbler motion, but had not been retained for trial. We have come to this understanding from the portions of the hearing wherein (1) Bruno said he was specially appearing at the hearing for Cohen, and (2) Bruno said Cohen had not been retained in response to the trial court setting a date for defendant to appear on the trial calendar. When read in context, the record reflects defendant had not yet retained Cohen for trial, but had retained him for the purpose of the wobbler motion. Thus, we conclude defendant did have counsel at the time of the wobbler motion.

## K.    CONFLICT OF INTEREST

In the alternative, defendant asserts he was denied effective assistance of counsel because Gunn's attorney's had a conflict of interest in representing defendant.[15] Defendant asserts Bruno's strategy for Gunn was to present her as the least culpable of the three codefendants, and therefore, Bruno could not properly represent defendant on the wobbler motion. Defendant highlights the portion of Bruno's response to the prosecution's opposition, in which Bruno wrote, "The court, having reviewed the transcript and the evidence, has recognized the disparity in culpability between Ms. Gunn and [defendant], and the indicated ruling reflects that balance."

---

[15] An attorney making a special appearance has an attorney-client relationship with the defendant for purposes of the hearing. (*Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441, 444, 447 [Fourth Dist., Div. Two].)

"A criminal defendant is guaranteed the right to the [effective] assistance of counsel by the Sixth Amendment to the United States constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.]" (*People v. Doolin, supra,* 45 Cal.4th at p. 417.) "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest 'that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citations.]" (*Id.* at pp. 417-418.) "[W]here a conflict of interest causes an attorney not to do something . . .[w]e must . . . examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (*Id.* at p. 418.)

Bruno had a conflict of interest in representing defendant during the special appearance. Bruno's argument for Gunn was that defendant and/or Boesen were the most culpable participants in the theft, and therefore, Gunn's offense should be considered a misdemeanor because she played a minor role in the crime and received a minor benefit from the crime. One of defendant's arguments was that *he* was the least culpable of the three theft participants because he was not a TMG employee, and therefore his crime should be reduced to a misdemeanor. Thus, Gunn's and defendant's arguments were opposed to one another—they both blamed Boesen, but they also, to an

extent, blamed one another. Each one tried to portray the other as more involved and more culpable.

At the hearing on the motion, Bruno made the restitution argument on behalf of defendant. When the trial court rejected the restitution argument, Bruno did not raise the "least culpable" argument on behalf of defendant, which logically would have placed Gunn in a poor light. We must determine whether the omitted argument would likely have been made by counsel who did not have a conflict of interest. It does appear the culpability argument would have been raised by an attorney without the conflict, because Cohen raised the argument in his supplemental memorandum. Additionally, it is a logical argument to raise when codefendants are present, e.g., I am the least culpable of my codefendants. Thus, we conclude an attorney without the Gunn-conflict would have argued that Boesen and Gunn were more culpable than defendant, due to their employment with TMG.

Next, we must consider whether there may have been a tactical reason, other than the asserted conflict of interest, that might have caused any such omission. After Bruno made the restitution argument, the trial court explained that the restitution might be relevant to sentencing, but was not relevant to the wobbler motion. Before the trial court moved on to Gunn's portion of the motion, a conflict-free attorney representing defendant would likely have asked the court to consider the culpability issue in regard to defendant. However, Bruno did not. Bruno moved onto Gunn's portion of the motion. There does not appear to be a tactical reason for Bruno to have failed to urge the court

48

to consider the culpability argument in relation to defendant.  Therefore, we conclude Bruno's performance was deficient due to the conflict of interest.

We now turn to the issue of harm.  Defendant must show "a reasonable probability that but for counsel's [conflict of interest], the result of the proceeding would have been different."  (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 421-422.)  The trial court in this case had the supplemental memorandum prepared by Cohen, which presented the culpability argument on behalf of defendant.  The trial court said at the motion hearing that it reviewed "the respective motions in this case."  Given that the trial court was aware of defendant's culpability argument from the moving papers, we conclude it is not reasonably probable a more favorable result would have occurred but for Bruno's representation of defendant because the trial court was aware of defendant's culpability argument and did not find it noteworthy.  Thus, it is unlikely a different result would have occurred if Bruno had actively argued the culpability issue on behalf of defendant.

L.      WOBBLER MOTION

Defendant asserts the trial court erred by applying an incorrect legal standard when denying defendant's request to reduce the theft to a misdemeanor and strike the enhancement.  (§ 17, subd. (b).)  Specifically, defendant faults the trial court for

49

applying a sufficiency of the evidence standard when ruling on the wobbler motion. (§ 17, subd. (b).)[16]

When the trial court denied defendant's portion of the joint motion, the trial court said, in regard to the restitution argument, "However, that may be an equity [factor], something [that] should be considered at the time of sentencing, but I certainly feel there's sufficient evidence for the charges to go forward on a second trial. [¶] Any motion with respect to [defendant] to dismiss or 17(b) the allegation would be denied at this time . . . ."

We independently review whether the trial court applied an incorrect legal standard. (*People v. Brunette* (2011) 194 Cal.App.4th 268, 276.) As set forth in the joint motion and identified by the trial court, there were two requests in the motion: (1) to strike the enhancement (§ 1385), and (2) to reduce the grand theft charge to a misdemeanor (§ 17, subd. (b)). The argument to dismiss the enhancement was based upon the theory that it would not serve the interests of justice to have a retrial in the case since no new evidence was available. In response to this request, the trial court considered the sufficiency of the evidence. (See *People v. Hatch* (2000) 22 Cal.4th 260, 273-274 [a trial court may dismiss charges for retrial pursuant to section 1385 if there is not substantial evidence].)

---

[16] In a wobbler motion, a trial court typically considers factors that are similar to sentencing factors, such as "'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.' [Citations.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978.)

Thus, the trial court's remarks about sufficiency of the evidence are directed toward the motion to dismiss. (§ 1385.) Additionally, the trial court's comments about the restitution issue being applicable to sentencing can also reasonably be understood as directed toward the motion to dismiss, e.g., the fact that defendant repaid Sorenson/TMG does not mean there is insufficient evidence to proceed with a retrial—it is an issue for sentencing.

The trial court did not state its reasons for denying the wobbler motion. (§ 17, subd. (b).) "[W]hen 'a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order.' [Citation.]" (*In re Julian R.* (2009) 47 Cal.4th 487, 499.) A statement of reasons is required when a court chooses to reduce a wobbler-felony to a misdemeanor. (*People v. Superior Court* (*Alvarez*), *supra*, 14 Cal.4th at p. 979 ["[T]he record should reflect a thoughtful and conscientious assessment of all relevant factors including the defendant's criminal history"].) However, it appears case law does *not* require a statement of reasons when a court decides to maintain a wobbler-felony as a felony. (See *Ibid.*) Since a statement of reasons was not required, and the record is silent as to the wobbler motion, we presume the trial court properly performed its duties when it denied defendant's wobbler motion. Thus, we conclude the trial court did not err.

M.    PROBATION

1.    *BACKGROUND LAW*

Section 1203.045, subdivision (a), provides probation shall not be granted to a person who steals an amount exceeding $100,000, "[e]xcept in unusual cases where the

51

interests of justice would best be served if the person is granted probation." Thus, in order for probation to be granted in defendant's case, a two-step process needed to occur: (1) the court needed to find this was an unusual case where the interests of justice would best be served by granting probation (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413); and (2) the court needed to find defendant was suitable for probation (Cal. Rules of Court, rule 4.414).

### 2. *PROCEDURAL HISTORY*

A presentencing probation officer's report reflects defendant's case was usual, thus, the rule prohibiting probation should apply. (§ 1203.045, subd. (a).) Nevertheless, the probation officer went on to the second step—analyzing whether probation should be granted. (Cal. Rules of Court, rule 4.414.) In regard to mitigating factors, the probation officer noted this was defendant's first conviction, he was willing to comply with the terms of probation, and there would be serious consequences to defendant being incarcerated, such as being unable to provide for his children and being deported. As to the factors in aggravation, the probation officer noted, the crime was serious, the victim's monetary loss was great, defendant actively participated in the crime, the crime was sophisticated, defendant was not remorseful, and defendant took on a leadership role during the offense.

The probation officer concluded that, although this was a usual case (triggering the presumption against probation) defendant should be granted probation. The probation officer noted defendant's lack of criminal history, strong family support, and four minor children as reasons to grant defendant probation. The probation officer

recommended four years of formal probation with the condition defendant serve 365 days in jail. Alternatively, the probation officer recommended defendant be incarcerated for three years.

The trial court directed the probation department to file a supplemental sentencing report addressing the realignment laws. The probation officer interpreted the trial court's order as a determination that defendant was unsuitable for probation. In the supplemental report, the probation officer recommended defendant be sentenced to three years in custody, with one year served in county jail and two years served on supervised release.

At the sentencing hearing, defendant's counsel, Cohen, questioned the supplemental report and whether the trial court had already determined defendant was unsuitable for probation. The trial court clarified that it believed probation was "legally available" to defendant, but the court had not yet decided if defendant was suitable for probation.

As to the first step—whether this is an unusual case—Cohen asserted it was unusual. Cohen argued the presumption against probation should not be applied in this case because defendant stole approximately $125,000, which was barely over the $100,000 triggering amount. Cohen asserted the presumption should apply in cases where "multiple hundreds of thousands of dollars" are taken. As to the interests of justice portion of the analysis Cohen noted this was defendant's first conviction and defendant was asked to be a trustee at the jail.

In regard to the second step in the process—whether defendant was suitable for probation—Cohen asserted defendant repaid Sorenson/TMG $108,000 prior to trial and again noted this was defendant's first conviction. Cohen also asked the court to sentence defendant to no more than a 364-day jail term, since a 365-day jail term or greater would require defendant be deported. Cohen asserted defendant would waive his 124 days of credits, so a 364-day jail term would have the same effect as a prison sentence.

The trial court denied probation. The trial court explained, "Counsel, $124,000 is a lot of money. It is a jaw dropping amount of money. It is a game changing amount of money." The trial court found defendant was the most culpable of the three codefendants. The trial court explained that defendant received the money and then "manipulated" Gunn and Boesen, who would not have participated in the crime without defendant's "suggestion and guidance." The court concluded, "This is simply not a probation case . . . ."

The court ordered a three-year jail sentence, with 360 days to be served in county jail and the remaining time served on supervised release. The trial court said, "What that means in terms of immigration, I do not know." The trial court explained it was not giving defendant a 360-day jail term for immigration reasons, rather, it selected the 360-day term because defendant was a non-violent offender and California jails are overcrowded. The trial court gave defendant credit for the 124 days he served, plus 62 days.

### 3.    *ANALYSIS*

#### a)    <u>Contention</u>

Defendant contends the trial court erred by denying him probation.  Specifically, defendant asserts (1) to the extent the trial court found this was not an unusual case, the court did not perform a proper analysis in making that determination (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413), and (2) the trial court erred in determining whether defendant was suitable for probation because the trial court did not consider the immigration consequences of defendant's sentence.  (Cal. Rules of Court, rule 4.414.)

#### b)    <u>Presumption</u>

We address defendant's first argument concerning the presumption against probation.  In particular, we address the preliminary issue concerning whether the trial court found defendant overcame the presumption against probation.

When Cohen asked the trial court about the supplemental probation officer's report, the trial court said it believed probation was "legally available" to defendant.  Cohen asked if the trial court had determined defendant was unsuitable for probation, and the trial court said it had not yet decided that issue.  Defendant infers from this conversation that the trial court concluded the presumption against probation (§ 1203.045, subd. (a)), did not apply in this case because it is an unusual case.  Defendant makes this inference from the trial court's comment that probation was "legally available," i.e., the presumption against probation did not apply.

We interpret the record differently than defendant.  We interpret the trial court's comments as indicating nothing had yet been decided.  The applicability of the

presumption had not yet been decided (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413) and defendant's suitability for probation had not yet been decided (Cal. Rules of Court, rule 4.414). Thus, when the trial court found (1) $124,000 was a significant amount of money to steal, and (2) defendant was the most culpable of the three codefendants, the court was analyzing whether this is an unusual case that should overcome the presumption against probation. (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413.) The trial court ultimately concluded, "This is simply not a probation case . . . ." We interpret the trial court's comment as concluding the presumption against probation was not overcome because this is a typical or usual case.

Given our interpretation of the record, we address defendant's assertion that the trial court erred in analyzing whether this is an unusual case. (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413.) Defendant contends the trial court improperly focused on the amount of money stolen.

California Rules of Court, rule 4.413(c) sets forth factors to consider when determining if a case is unusual: (1) if the fact giving rise to the presumption against probation is "substantially less serious than the circumstances typically present in other cases involving the same" presumption against probation; (2) the defendant has no recent record of committing similar crimes or crimes of violence; (3) defendant

56

committed the crime "under circumstances of great provocation, coercion, or duress";

and (4) defendant has no significant record of prior criminal offenses.[17]

As to the first factor—whether the crime is substantially less serious than similar crimes—the trial court said, "Counsel, $124,000 is a lot of money. It is a jaw dropping amount of money. It is a game changing amount of money." The trial court continued, "It's enough to drive a business out of business. It's enough to have ripple effects. It's a lot of money. Far more than we can be minimized [*sic*] by saying it's only a little bit over the threshold of a lot of money." The trial court made these remarks in response to Cohen's assertion that this case was less serious than similar cases because similar cases involve the theft of "multiple hundreds of thousands of dollars."

The trial court's comments reflect its finding that defendant's theft was just as serious as crimes concerning the theft of more money because (1) $124,000 is still a great deal of money, and (2) the victims did not have vast financial resources, which created the "ripple effect" mentioned by the trial court. For example, Sorenson stated the loss of the money caused him to lay off some of his employees, and, in turn, some of those employees lost their homes. Additionally, Ihnken's granddaughter was paying a probate attorney to locate Ihnken's money, so the granddaughter presumably incurred attorney's fees in trying to locate the escrow money. Ihnken's granddaughter asserted she was still owed approximately $3,000 from the sale of Ihnken's house. Thus, the record reflects the trial court considered whether defendant's crime was substantially

---

[17] We have omitted some of the factors that are not relevant to this case, such as a factor related to the defendant's mental condition. (Cal. Rules of Court, rule 4.413.)

57

less serious than similar crimes, and the trial court concluded defendant's crime was as serious as other crimes due to (1) the amount of money being enough to shutdown or nearly shutdown TMG, and (2) the "ripple effects" caused by the theft.

As to the second factor and fourth factors, there was no debate regarding defendant's criminal history. It appears to have been conceded that defendant did not have a lengthy criminal history. For the third factor—whether defendant committed the crime "under circumstances of great provocation, coercion, or duress"—the trial court found defendant was the most culpable of the three codefendants. The trial court explained that defendant received the money and then "manipulated" Gunn and Boesen, who would not have participated in the crime without defendant's "suggestion and guidance." It appears from the trial court's comments that it concluded defendant did not commit the crime under great provocation, coercion, or duress, since defendant "was the mastermind" behind the crime.

Given that the trial court went through the disputed factors, explained the reasons for its findings, and weighed the issues, we conclude the trial court properly followed the law in determining whether this was an unusual case. (Cal. Rules of Court, rule 4.413.) In sum, we find defendant's argument to be unpersuasive.

c)      Suitability

Defendant contends the trial court erred in determining defendant's suitability for probation because the trial court failed to consider the immigration consequences of

imposing a three-year jail sentence.[18] (Cal. Rules of Court, rule 4.414.) Defendant contends the trial court was not fully informed about how its sentencing decision would impact defendant being deported, and therefore the court acted without informed discretion when sentencing defendant.

Defendant's argument is not persuasive because the trial court did not consider defendant's suitability for probation. (Cal. Rules of Court, rule 4.414.) Rather, the trial court stopped after determining the presumption against probation applied in this case. (§ 1203.045, subd. (a); Cal. Rules of Court, rule 4.413.) Because this presumption applied, the trial court could not grant defendant's request for 364 days of jail plus a term of probation. So, instead, the court imposed a three-year jail term with two years served on supervised release. In sum, the trial court did not err because the trial court never reached the part of the analysis where it could consider defendant's suitability for probation. (Cal. Rules of Court, rule 4.414.)

## N. CUMULATIVE ERROR

Defendant asserts the cumulative effect of the alleged errors requires the judgment be reversed. Defendant failed to establish prejudice on the speedy trial issue. We concluded *ante*, the error in failing to instruct the jury that accomplice testimony must be viewed with caution and be corroborated (CALCRIM No. 335) was harmless. We also concluded defendant did not suffer prejudice due to Bruno's representation of

---

[18] The trial court imposed a three-year jail sentence with one year served in jail and two years served on supervised release. At trial, defendant requested a 364-day jail sentence to be followed by a period of probation.

59

defendant at the hearing on the wobbler motion (§ 17, subd. (b)) and motion to strike the enhancement (§ 1385).

These errors, which are not prejudicial when considered individually, are also not prejudicial when considered cumulatively. As set forth *ante*, there was sufficient corroboration for Gunn's and Boesen's testimonies, and the motion arguments were presented to the trial court via Cohen's supplemental memorandum. Thus, the prejudice does not become magnified by the errors being combined. Whether considered together or apart, prejudice has not been shown.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

RICHLI _____
Acting P. J.

KING _____
J.

60